THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLIFFORD HEARNE, an individual,

Plaintiff,

v.

HUB BELLEVUE PROPERTIES, LLC, a Delaware Limited Liability Company, *et al*.,

Defendants.

CASE NO. 16-1010-JCC

ORDER

This matter comes before the Court on Defendant HUB Properties, LLC's motion for summary judgment (Dkt. No. 42) and Plaintiff's motion for partial summary judgment (Dkt. No. 46). Having considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES Defendant's motion for summary judgment and DENIES in part and GRANTS in part Plaintiff's motion for partial summary judgment for the reasons explained herein.

## I. BACKGROUND

Defendant owns real property located at 333 108th Street NW, Bellevue, commonly known as the "Expedia Building." (Dkt. No. 42 at 2.) At the time of the events at issue in this case, Plaintiff worked at Expedia on the Expedia Building's fourth floor. (*Id.*) On March 1, 2016, Plaintiff was riding in Elevator TE-5. (*See id.* at 3; Dkt. No. 43 at 17, 35.) When Elevator 5 was descending between the fourth and third floors, it suddenly dropped a short distance and came to

an abrupt stop. (Dkt. No. 43 at 18, 35.) Shortly thereafter, Elevator 5 began to function normally, and Plaintiff was able to descend to the lobby. (*Id.* at 17–18.) Plaintiff reported the incident to the Expedia Building's security office, which drafted a report describing the incident. (*Id.* at 35.) The report stated that Plaintiff's right knee and ankle were injured. (*Id.*) The report further stated that "the building experienced a short brown out at 15:20. At that time, a few of the elevators dropped a ways and [the security office] got a lot of intercom calls, but shortly afterwards they all started moving again." (*Id.*)

Defendant contracts with Otis Elevators to maintain and inspect the Expedia Building's elevators. (*See* Dkt. Nos. 42 at 2, 5; 43 at 6, 11, 37–54.) Following the March 1 incident, Defendant asked Otis technician Larry Hatch to inspect Elevator 5, telling him that the elevator had stopped because of a "power outage." (*See* Dkt. No. 43 at 21–22, 24–26.) According to Mr. Hatch, the inspection was meant "to verify the safety of the elevator," not to determine the cause of the March 1 incident. (*See id.* at 26.) Mr. Hatch found Elevator 5 to be safe to resume operations. (*See id.* at 23–24, 27, 30.) That finding was consistent with previous inspections by the Washington State Department of Labor & Industries ("L&I"), which did not reveal any deficiencies in Elevator 5 prior to March 1, 2016. (*See id.* at 56–58.)

Although multiple inspections found that Elevator 5 had no deficiencies, there were signs that the Expedia Building itself was experiencing power fluctuations. Craig Mikkila, Defendant's chief building engineer, said that the building experienced "power bumps" upwards of 10 times a year. (*See* Dkt. No. 47-3 at 6–7.) Mr. Mikkila admitted that those power bumps caused the "lights [to] flicker a few times." (*See id.* at 6.) But the power bumps may have also caused issues with the elevators. For example, on November 2, 2015, Otis serviced Elevator 6, which was "stuck on the lobby level with doors closed." (Dkt. No. 47-7 at 1.) Otis determined that the problem was "[n]ot equipment related. Faults show[ed] [a] power spike to incoming 3 phase power." (*Id.*) And on October 19, 2015, Otis serviced Elevator 2 and found, "all overhead lights are out. Customer shut down on level 'B'. Not equipment related. Mechanic found 110V breaker

in the off position. Reset breaker." (Dkt. No. 47-8 at 1.) Similarly, on March 24, 2014, Otis reported that Elevator 5 was stuck on the lobby level with its doors open due to a "power failure" that was "not equipment related." (Dkt. No. 47-10 at 1.)

On May 16, 2016, Plaintiff filed suit against Defendant[1] in King County Superior Court, asserting claims of negligence and breach of Defendant's common carrier duty. (*See* Dkt. No. 1-3 at 3.) On June 30, 2016, Defendant removed the case to the Court. (Dkt. No. 1.) Both parties now move for summary judgment. (Dkt. Nos. 42, 46.)

## II. DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In deciding whether there is a genuine dispute of material fact, the court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Id.* at 255. The court is therefore prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

"The moving party bears the initial burden of establishing the absence of a genuine issue

---

[1] The complaint originally named CBRE, Inc., a Delaware corporation, as an additional defendant. In April 2017, the parties filed a stipulated motion to allow Plaintiff to amend his complaint. (Dkt. No. 11.) The proposed amended complaint removed CBRE, Inc. as a party. (*See* Dkt. No. 11-1 at 1.) Although the Court granted the motion to amend, the Court specifically stated, "However, the amendment shall not take effect until the amended complaint, currently posted as Docket Number 11-1, is refiled as a stand-alone document." (Dkt. No. 12 at 1.) For reasons that are unclear to the Court, Plaintiff did not file an amended complaint in accordance with the Court's order. But Defendant has submitted both the amended complaint and Defendant's answer to the amended complaint in support of its motion for summary judgment, which the Court shall consider in ruling on the parties' motions for summary judgment. (*See* Dkt. No. 43 at 5–8, 10–13.)

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But once the moving party properly supports its motion, the nonmoving party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**B.     Discovery Issues**

Plaintiff raises three discovery-related issues. First, Plaintiff argues that the Court should not consider the declaration or report of Pat Burke because Defendant failed to disclose Mr. Burke as a witness or to produce his report. (*See* Dkt. No. 61 at 3–5.) Second, Plaintiff argues that the Court should not consider the reports of two forensic doctors, Dr. Ramon Kutsy and Dr. Patrick Bays, because Defendant did not disclose those reports until after the close of discovery. (*See id.*) Third, Plaintiff asks the Court to sanction Defendant for failing to preserve the elevator logs that recorded the incident involving Plaintiff. (*See* Dkt. No. 46 at 16–19.) The Court will address each issue in turn.

1.     Declaration and Report of Pat Burke

Under Federal Rule of Civil Procedure 37(c)(1), a party is ordinarily barred from using information or a witness to supply evidence on a motion if the party failed to identify the witness or to provide the information as required by Federal Rule of Civil Procedure 26(a). *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 11101, 1106 (9th Cir. 2001). This rule is a "'self-executing,' 'automatic' sanction" intended to "provide[] a strong inducement for disclosure of material." *Id.* (quoting Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment). The

rule applies "unless the failure [to disclose] was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, Defendant was required to identify Mr. Burke because he was, at the very least, an "individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." *See* Fed. R. Civ. P. 26(a)(1)(A)(i). Yet, Defendant failed to identify Mr. Burke despite being asked to identify all expert or fact witnesses. (*See* Dkt. Nos. 62-2 at 7–8, 62-3 at 1–2, 62-4 at 1–4.) Defendant's failure to identify Mr. Burke for over a year is not substantially justified. Nor was Defendant's failure harmless, as it deprived Plaintiff of the opportunity to depose Mr. Burke about his findings, conclusions, and qualifications. Accordingly, the Court will not consider Mr. Burke's declaration or report in ruling on the parties' motions for summary judgment, and Defendant is prohibited from calling Mr. Burke or using his report at trial.

2. Reports of Dr. Kusty and Dr. Bays

Federal Rule of Civil Procedure 26(a)(2)(B) requires a party to disclose the written report of any witness who is "retained or specially employed to provide expert testimony in the case." This rule obligated Defendant to disclose the reports of Dr. Kusty and Dr. Bays in June 2019, when Defendant disclosed that it intended to call both doctors "to testify regarding [the] reasonableness and necessity of Plaintiff's treatment." *See* Fed. R. Civ. P. 26(a)(2)(A)–(B); (Dkt. No. 62-4 at 2). Defendant did not do so. Instead, Defendant waited until December 18, 2019—after the close of discovery—to send Dr. Kusty's and Dr. Bays's reports to Plaintiff. (Dkt. No. 62-5 at 1.) Defendant's failure to send those reports in June was unjustified and harmful because it deprived Plaintiff of the opportunity to depose Dr. Kusty and Dr. Bays. Consequently, the Court will not consider the two reports in ruling on the parties' motions for summary judgment, and Defendant is prohibited from using those reports at trial. *See Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (affirming district court's decision to exclude expert reports where a party "didn't realize" she needed to timely disclose the reports).

3. Spoliation

District courts possess inherent authority to impose sanctions against a party in response to the party's spoliation of relevant evidence. *See Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009). The party alleging spoliation must prove that (1) the evidence was relevant to a claim or defense; (2) the party having control over the evidence was obligated to preserve it at the time it was destroyed; and (3) the records were destroyed with a "culpable state of mind." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)) (collecting cases applying the Second Circuit's three-part test). The second element is met if the party with control over the evidence should reasonably have known that the evidence might have been relevant to anticipated litigation. *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011). The third element is met if the party acted with "conscious disregard" of its discovery obligations; a finding of bad faith is not required. *See Apple Inc.*, 888 F. Supp. 2d at 998 (citing *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 n.2 (9th Cir. 1992)); *Hamilton v. Signature Flight Support Corp.*, 2005 WL 3481423, slip op. at 7 (N.D. Cal. 2005).

*i. Relevance*

The elevator logs relating to Plaintiff's incident were undoubtedly relevant to Plaintiff's claim. Mr. Hatch, Otis's speaking agent, says that the logs could potentially show that Elevator 5 stopped because of a power loss. (*See* Dkt. No. 49-1 at 10–12.) Defendant's elevator expert agrees with Mr. Hatch, stating that "[a] power outage . . . might have thrown off a code inside the REM that we could have seen after the fact." (*See* Dkt. No. 72 at 19.) Thus, the elevator logs might have shed light on the critical issue of proximate cause—that is, whether Elevator 5 shut down on March 1, 2016, because it lost power or because of some other issue.

*ii. Obligation to Preserve*

It is unclear when the elevator logs were deleted. Defendant claims that Otis deleted the logs on March 14, 2016, when Otis serviced Elevator 5 in response to a service call that was unrelated to the March 1 incident. (*See* Dkt. Nos. 58 at 11, 60 at 150.) But to support its claim, Defendant points to an email indicating only that Otis serviced the elevator on March 14; Defendant provides no evidence that the logs were deleted on that date. (*See* Dkt. Nos. 58 at 11, 60 at 150.) Regardless, even if the Court assumes that the logs were deleted on March 14, Defendant should reasonably have known by March 14 that the logs might have been relevant to anticipated litigation. This is true for two reasons.

First, Plaintiff mailed Defendant a litigation hold letter informing Defendant that Plaintiff was contemplating legal action and demanding that Defendant preserve materials relating to the March 1 incident. (*See* Dkt. No. 47-21 at 1.) Plaintiff mailed the letter on March 11, 2016, via certified mail. (*See id.*); *Payan v. Armark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119 (9th Cir. 2007) ("We begin with the presumption that the letter issuance date is also the date on which the letter was mailed.") The Court therefore presumes that the letter arrived within three days, and Defendant has offered no evidence to rebut that presumption. *See Payan*, 495 F.3d at 1125–26 (adopting a three-day presumption and noting that the presumption accords with Federal Rule of Civil Procedure 6(e)). Consequently, Defendant was on notice by March 14 that it should have preserved the elevator logs.

Second, it should not have taken a litigation hold letter for Defendant to have known it needed to preserve the elevator logs. Shortly after Plaintiff's elevator abruptly stopped, Plaintiff informed the Expedia Building's security office that the sudden stop "hyper extended his knee" and that he "could feel it messed up the tendons in his calf." (Dkt. No. 43 at 35.) Given that Plaintiff reported such serious injuries, Defendant should reasonably have anticipated that Plaintiff might bring a lawsuit. And because the elevator logs were obviously relevant to any such lawsuit, Defendant should have preserved them.

*iii. Conscious Disregard*

By failing to preserve elevator logs that were obviously relevant to litigation that Defendant should have anticipated, Defendant acted with "conscious disregard" of its discovery obligations. *See Apple Inc.*, 888 F. Supp. 2d at 998; *Hamilton*, 2005 WL 3481423, slip op. at 7. Defendant's conscious disregard is made even more apparent by its failure to follow the requirements of Wash. Rev. Code § 70.87.190. That statute required Defendant to notify L&I that Plaintiff had been injured in an elevator accident, to allow L&I to investigate the accident, and to "place on file a full and complete report of the accident" containing "all material facts and information available" regarding the causes of the accident. *See* Wash. Rev. Code § 70.87.190. Defendant disregarded those requirements, just as it disregarded its discovery obligations. Accordingly, the Court GRANTS Plaintiff's request for spoliation sanctions.

*iv. Sanctions*

When spoliation has occurred, a district court may impose a variety of sanctions, including:

> (1) exclusion of evidence, (2) admitting evidence of the circumstances of the destruction or spoliation, (3) instructing the jury that it may infer that the lost evidence would have been unfavorable to the party accused of destroying it, or (4) entering judgment against the responsible party, either in the form of dismissal or default judgment.

*Pettit v. Smith*, 45 F. Supp. 3d 1099, 1105 (D. Ariz. 2014). The Court concludes that an adverse jury instruction is appropriate in this case. If Defendant contests causation at trial, then the Court will instruct the jury that it may infer that the elevator logs would have been unfavorable to Defendant because the logs would have shown that Elevator 5 shut down on March 1, 2016, due to a power fluctuation.

**C. Common Carrier Negligence**

Under Washington law, negligence consists of (1) a duty owed to the claimant, (2) a breach of that duty, (3) a resultant injury, and (4) proximate causation. *Reynolds v. Hicks*, 951 P.2d 761, 763 (Wash. 1998). Defendant concedes that as the operator of an elevator, it owed

Plaintiff the duty of a common carrier. (*See* Dkt. Nos. 42 at 12, 46 at 13–14.) However, Defendant moves for summary judgment on the issue of breach, arguing that it is not liable for elevator stops caused by sporadic power fluctuations.[2] (*See* Dkt. No. 42 at 8–15.) Plaintiff also moves for summary judgment, arguing that the evidence irrefutably shows that Plaintiff was injured due to a power problem that was internal to the Expedia Building and was known to Defendant. (*See* Dkt. No. 46 at 19–22.) The Court concludes that summary judgment is inappropriate for either party because genuine disputes exist as to the following issues: (1) whether and to what extent the Expedia Building experienced internal power problems affecting the building's elevators; (2) whether Defendant knew of those problems; and (3) whether Defendant negligently failed to correct those problems.

1. The Duty of a Common Carrier

A common carrier owes "the highest degree of care to its passengers, commensurate with the practical operation of its conveyance at the time and place in question." *Tinder v. Nordstrom*, 929 P.2d 1209, 1214 (Wash. Ct. App. 1997) (quoting *Houck v. Univ. of Wash.*, 803 P.2d 47, 50 (Wash. Ct. App. 1991)) (internal quotation marks omitted). This heightened standard of care does not, however, make common carriers insurers of their passengers' safety, and the fact that an accident occurred does not establish that the common carrier breached its duty of care. *Id.* at 1213–1215 & n.35 (rejecting application of *res ipsa loquitur* where person fell when an escalator unexpectedly stopped); *Adams v. W. Host, Inc.*, 779 P.2d 281, 284 (Wash. Ct. App. 1989) (rejecting application of *res ipsa loquitur* where person was injured because an elevator misleveled). On the contrary, to prove breach, the plaintiff must show that the common carrier had actual or constructive notice of malfunctions or defects. *See Murphy v. Montgomery*

---

[2] Defendant does not appear to move for summary judgment on the issue of causation. Instead, Defendant seems to assume, at least for purposes of argument, that Elevator 5 stopped because of a power fluctuation. (*See* Dkt. No. 58 at 5) ("Plaintiff's contention is that a power outage . . . caused Elevator 5 to come to a fleeting stop . . . . The question then becomes, did random, intermittent power flickers . . . put HUB on notice of a potentially dangerous situation?").

*Elevator Co.*, 828 P.2d 584, 586 (Wash. Ct. App. 1992). The issue of breach is "generally [a] fact question[] and not subject to summary judgment." *Jackass Mt. Ranch, Inc. v. S. Columbia Basin Irrigation Dist.*, 305 P.3d 1108, 1118–19 (Wash. Ct. App. 2013).

2. Existence and Notice of Power Problems

Plaintiff alleges that in the months and years leading up to the March 1 incident, the Expedia Building regularly experienced power losses that Defendant knew or should have known were causing elevators to stop. (*See* Dkt. No. 46 at 20.) Plaintiff's evidence establishes that Defendant knew or should have known that its building experienced power fluctuations. (*See, e.g.*, Dkt. No. 47-3 at 5–7) (statement by chief building engineer acknowledging that the building may have experienced power bumps at least 10 times per year). Plaintiff's evidence also establishes that Defendant knew or should have known that those power fluctuations affected the elevators in the Expedia Building to some degree. (*See* Dkt. Nos. 47-7 at 1, 47-8 at 1, 47-9 at 1) (service reports and invoices from Otis describing power problems in elevators). However, the extent and severity of those power fluctuations is unclear—as is their impact on the Expedia Building's elevators. For example, it is unclear whether the routine power bumps described by Mr. Mikkila caused elevators to shut down or whether they merely caused the building's lights to flicker.[3] (*See* Dkt. No. 47-3 at 5–7.) And while it appears that Otis serviced three[4] elevators that

---

[3] Plaintiff argues that a reasonable jury must conclude that these power flickers frequently shut down elevators because "there is no dispute . . . that if there is an interruption of power, the elevators will come to an emergency stop." (*See* Dkt. No. 46 at 5–6.) Plaintiff's elevator expert similarly assumes that the power flickers described by Mr. Mikkila caused elevators to stop. (*See* Dkt. No. 50-2 at 5.) However, Defendant's 30(b)(6) witness did not state that any loss in power, no matter how small, would cause elevators to stop; he testified that a 20 percent drop in power would cause elevators to stop. (*See* Dkt. No. 47-6 at 8.) And Mr. Mikkila did not state that the building experienced a 20 percent drop in power whenever there was a power bump; he said that the "lights [would] flicker a few times." (*See* Dkt. No. 47-3 at 5–7.) It is, therefore, unclear from this record whether the Expedia Building routinely experienced power drops sufficient to shut down the elevators in the building.

[4] Plaintiff claims that Otis serviced six elevators that had shut down because of power issues. (*See* Dkt. No. 46 at 2, 6–7.) Plaintiff seems to have arrived at the number six by counting the number of days in which Defendant placed a service call to Otis, Otis dispatched a technician,

had shut down due to power issues, the nature and severity of those issues is not readily apparent from the face of Otis's invoices and reports. (*See* Dkt. Nos. 47-7 at 1, 47-8 at 1, 47-9 at 1.) Given these uncertainties, the Court cannot decide as a matter of law that power problems were routinely causing the Expedia Building's elevators to shut down or that Defendant knew of such shut downs. Those uncertainties must be resolved by a jury. *See Tolan*, 572 U.S. at 657; *Jackass Mt. Ranch*, 305 P.3d at 1118–19. Accordingly, the Court DENIES Plaintiff's motion as to the issue of breach.

3. Malfunctions or Defects

Defendant argues that even if power fluctuations were causing elevators to stop, there is no evidence that those power fluctuations were the result of negligence—*i.e.*, that the Expedia Building was "defective." (*See* Dkt. No. 42 at 8–15.) However, Plaintiff presents evidence from which a reasonable jury could conclude that the power fluctuations—assuming they did shut down elevators—were caused by problems internal to the building and that Defendant should have fixed those problems. For example, Vincent Rabon, a senior project manager at Puget Sound Energy, reviewed PSE's records of the power it supplies to the Expedia Building, finding "no record of a power outage or other service issue or interruption" during key dates in 2014, 2015, and 2016. (*See* Dkt. No. 47-12 at 5–7.) Based on that finding, Mr. Rabon concludes that the power fluctuations were "more likely than not . . . caused by the building drawing too great a load on its transformer or some other internal issue." (*Id.* at 7.) Mr. Rabon's conclusion is echoed by Plaintiff's elevator expert, who states that Defendant violated its duty of care by failing to investigate and fix internal power issues that were causing elevators to shut down. (*See* Dkt. No. 50-2 at 9–13.) That statement is also supported, at least to some extent, by Defendant's own elevator expert, who said in a deposition that "if I had a property manager come to me and say the elevator company's saying that we have power issues, that's why my elevators are shutting

---

and Otis sent Defendant an invoice as separate incidents. (*Compare* Dkt. No. 46 at 2, 6–7, *with* Dkt. Nos. 47-7 at 1, 47-8 at 1, *and* 47-9 at 1.)

down or . . . getting people trapped," then it would be "unreasonable" to ignore the issue and that the property manager should do "whatever it takes" to fix it. (*See* Dkt. No. 72 at 23.)

Plaintiff's evidence makes this case far different than cases like *Tinder v. Nordstrom*, 929 P.2d 1209 (Wash. Ct. App. 1997). In *Tinder*, the plaintiff unsuccessfully relied on *res ipsa loquitor* while offering no specific evidence to prove that the escalator at issue malfunctioned due to a detectable defect. *Id.* at 1211–13. Here, by contrast, Plaintiff offers specific evidence from which a reasonable jury could conclude that (1) there were power fluctuations in the Expedia Building affecting the building's elevators, (*see* Dkt. Nos. 47-3 at 5–7, 47-7 at 1, 47-8 at 1, 47-9 at 1); (2) those fluctuations were not caused by external power problems, (*see* Dkt. No. 47-12 at 5–7.); (3) as a result, those fluctuations must have been caused by problems internal to the building, (*see id.* at 7); and (4) by failing to fix those internal power problems, Defendant violated its duty to take "the highest degree of care," (*see* Dkt. Nos. 50-2 at 9–13, 72 at 23). Accordingly, the Court DENIES Defendant's motion for summary judgment as to the issue of breach.

**D. Reasonable and Necessary Medical Treatment**

Plaintiff moves for partial summary judgment on the issue of damages, asking the Court to hold that he has incurred $259,358.60 in reasonable medical expenses. (*See* Dkt. No. 46 at 22–24.) To prove that those expenses were reasonable, Plaintiff offers the declaration of Karen Wilkinson, a nurse practitioner. (*See generally* Dkt. No. 47-19.) In response, Defendant offers the reports of Dr. Bays, Dr. Kusty, and William Skilling, a rehabilitation counselor. (*See* Dkt. No. 60 at 132–148.) Although the Court will not consider Dr. Bays's or Dr. Kusty's reports, Mr. Skilling's report is admissible, and it contradicts many of Ms. Wilkinson's conclusions.[5] (*See*

[5] In his reply, Plaintiff argues that Mr. Skilling lacks proper credentials and that it is illegal for him to provide a medical opinion about the reasonableness or medical necessity of Plaintiff's treatment. (*See* Dkt. No. 61 at 11.) Plaintiff cites no caselaw to support his argument, and the Court will not rule on the issue absent further briefing from both parties. (*See id.*) If Plaintiff wishes to renew his argument with proper support, then the Court may also reconsider its

*id.*) Accordingly, there are genuine disputes over the value of Plaintiff's reasonable medical expenses. The Court therefore DENIES Plaintiff's motion for summary judgment as to this issue.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion for summary judgment (Dkt. No. 42) and DENIES in part and GRANTS in part Plaintiff's motion for partial summary judgment (Dkt. No. 46).

DATED this 15th day of May 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

conclusion that there are genuine disputes of fact regarding the value of Plaintiff's reasonable medical expenses.